# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

MARILYN K. DAVIDSON,      )
       Plaintiff,           )
                          )
       v.                  )      CAUSE NO.: 2:12-CV-293-PRC
                          )
CAROLYN W. COLVIN,        )
Acting Commissioner of the    )
Social Security Administration,  )
       Defendant.       )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Marilyn K. Davidson on July 26, 2012, and a Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 14], filed on November 14, 2012. Plaintiff requests that the decision of the Administrative Law Judge denying her claims for disability insurance benefits and supplemental security income be reversed or remanded for further proceedings. On February 22, 2013, the Commissioner filed a response, and Plaintiff filed a reply on March 8, 2013. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On November 19, 2010, Plaintiff filed applications for disability insurance benefits and supplemental security income, alleging an onset date of October 1, 2009. The applications were denied initially on February 7, 2011, and upon reconsideration on April 4, 2011. Plaintiff timely requested a hearing, which was held on September 28, 2011, before Administrative Law Judge ("ALJ") Bryan J. Bernstein. In appearance were Plaintiff, her attorney Kenneth McVey, and vocational expert Sharon D. Ringenberg. The ALJ issued a written decision denying benefits on January 12, 2012, making the following findings:

1.	The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2.	The claimant has not performed substantial gainful activity since the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.	The claimant has severe impairments.

4.	The claimant failed to establish with reliable evidence that she has an impairment or combination of impairments that meets or medically equals any one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.	The claimant failed to establish with reliable evidence that she experiences limitations that would be more restrictive than the limitations accommodated in the residual functional capacity considered here and presented to the vocational expert.
. . .
This individual is not able to perform work that imposes close regimentation of production. . . . This person cannot lift and carry more than 10 pounds occasionally and 5 pounds frequently. She predominantly uses her nondominant hand for lifting. This person cannot successfully engage in work demanding constant manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with hands or fingers. This person cannot undertake work in hazardous conditions. Such work would include work requiring balance in the context of unprotected heights. This individual cannot work around dangerous machinery or around vehicles moving in close quarters. The claimant's lifting would involve predominant use of the non-dominant hand.

6.	The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.	The claimant was born on [ ], 1962, and was 47 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.	The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.	Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(AR 17-25).

On April 23, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On July 26, 2012, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Commissioner's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Background

Plaintiff was born in 1962 and was 47 years old on the alleged onset date. She completed the 12th grade as well as six weeks of certified nursing assistant ("CNA") training. Her prior relevant work includes employment as a machine operator (heavy as performed), driver (medium per the DOT), assembly work (light work as performed), and CNA (heavy as performed, medium per DOT).

**B. Medical Background**

*1.      Treatment History*

Plaintiff presented at the emergency room on September 27, 2009, after passing out briefly and reported a history of seizures since age nine, migraine headaches, insomnia, and dizziness. Plaintiff declined hospitalization. The diagnosis was acute orthostatic syncope, etiology uncertain; multiple system complaints and weight loss; and possible depression. A head CT that same date was normal. A chest x-ray revealed mild pulmonary hyperinflation with no acute disease. A brain MRI showed a moderate number of small bilateral white matter lesions in the cerebral hemispheres ranging in size up to 8 to 10 mm with possibilities including chronic small vessel disease, demyelinating process such as multiple sclerosis, prior inflammation, or vasculitis. Also that date, a Holter monitor confirmed isolated atrial premature complexes, intermittent sinus arythmia, and intermittent sinus tachycardia.

On October 2, 2009, Plaintiff sought treatment at the Matthew 25 Clinic for headaches and follow up of her emergency room visit, reporting depression, nausea, and migraines noted to be frontal with photophobia and lasting about once per week for a period of 5-10 years. Plaintiff's medications were Amitriptyline, Imitrex, and Effexor XR.

On October 13, 2009, a Holter monitor again showed intermittent sinus arrhythmia and intermittent sinus tachycardia, simple ventricular arrythmia, and isolated premature ventricular complexes. A Doppler confirmed left ICA at less than 50% stenosis. The same day, a brain MRI revealed a moderate number of small bilateral white matter lesions ranging from 8-10 mm. An ECG was technically adequate with ejection fraction at 60% and trace insufficiency in the mitral valve.

On November 30, 2009, Plaintiff was treated at the Matthew 25 Clinic for persistent migraine headaches and GI complaints. Effexor was discontinued, and Protonix was prescribed. She was to continue taking Amitriptyline each night.

In December 2009, Plaintiff was administered an adrenocorticotropic hormone ("ACTH") stimulation test for adrenal insufficiency at Parkview Hospital.

A January 20, 2010 brain MRI again revealed extensive white matter hyper intensities either from old inflammation, demyelinating process, migraines, or vasculitis.

On February 26, 2010, Plaintiff returned to the Matthew 25 Clinic for a scheduled follow up on depression. She reported depression, migraine headaches, and carpal tunnel syndrome. She reported that her gastrointestinal complaints were resolved. However, she reported that the Amitriptyline helped her sleep but did not help the headaches. For her carpal tunnel syndrome, the treatment note says that the plan is the "ortho clinic." (AR 367).

On June 8, 2010, Plaintiff was treated at the Matthew 25 Clinic for migraine headaches (frequency of twice a week) and gastroesophageal reflux disease. Imitrex was discontinued and Plaintiff was prescribed Ultram for her headaches. She was continued on Protonix. A note indicates that an EEG was not ordered due to financial reasons. Plaintiff also declined a GI referral for financial reasons.

On June 29, 2010, Plaintiff returned to the Matthew 25 Clinic. She reported falling at work in September 2009, a history of seizures since age 11, and migraine headaches for 10-12 years. She reported that the headaches, left frontal or bilateral, had become especially bad in the previous two years, with four to five headaches a day, throbbing, photophobia, and nausea. Imitrex had in the past

provided some benefit but it no longer worked. The doctor determined that preventative medication was needed and prescribed Topamax. Plaintiff also reported insomnia.

On August 4, 2010, Plaintiff was seen at the Matthew 25 Clinic, reporting chronic issues of gastroesophageal reflux disease, headaches, insomnia, migraines, and seizures. She reported that her headaches had decreased from daily to three times a week and were less severe. She was tolerating the Topamax well, and the doctor continued her on Topamax. Naproxen was added due to migraines and a history of seizures.

On September 10, 2010, Plaintiff was treated at the Matthew 25 Clinic, reporting chronic issues of gastroesophageal reflux disease, headaches, insomnia, migraines, and seizures. Her Amitriptyline was discontinued, and she was prescribed Citalopram. Prescriptions for Naproxen, Protonix, Topamax, and Ultram were continued.

On November 19, 2010, Plaintiff was seen at the Matthew 25 Clinic for depression and other psychological issues as well as migraines and gastroesophageal reflux disease. She was continued on Naproxen, Protonix, Topamax, and Ultram, and her Citalopram was adjusted. She was directed to follow up in four months.

On November 24, 2010, Plaintiff reported that her headaches had returned one month earlier, four to five a week. The headaches were bifrontal with neck tension. She also complained of insomnia and numbness and tingling. The treater noted that Plaintiff looked "unhappy." (AR 441). The diagnosis was migraines, depression, and seizures. The Topamax prescription was increased. The doctor suggested that she might benefit from a different anti-depressant.

On April 13, 2011, Plaintiff was treated at the Matthew 25 Clinic for "wicked thoughts" with a notation of depression, suicidal ideation, insomnia, migraines, and epilepsy. (R. 434-37). Cymbalta

was discontinued and she was prescribed Protonix, Topamax, and Ultram. Plaintiff returned on June 8, 2011 for depression. On July 12, 2011, she was treated for depression, seizures, gastroesophageal reflux disease, and daily migraines.

In response to the ALJ's questioning at the hearing, Plaintiff's counsel indicated that there were no EMGs in the record for the Plaintiff's upper extremities or any treatment as to her carpal tunnel syndrome since the 2005 surgery.

2.      *Reports of Consultative Examinations and Reviewers*

a.      Physical impairments

On February 16, 2010, Plaintiff underwent a consultative examination for her complaint of disability due to carpal tunnel syndrome by family practitioner Michael E. Holton, M.D. Plaintiff reported that she had surgery on the right hand for carpal tunnel syndrome in 2005, that she had had temporary improvement of the numbness and weakness of the hand, but that the symptoms had returned. She had persistent numbness and weakness of both hands and reported that she drops items unexpectedly. She reported nocturnal pain, even with using wrist braces. She told Dr. Holton that she performed dressing and hygiene measures independently most of the time, but that she needed help at times with cooking and washing dishes because her hands go numb. She reported no problems with sitting, standing, or walking. Plaintiff reported that she suffered from depression, blurred vision/photophobia, seizures, and a degree of headaches every day for about four to five times per week that persisted even with Imitrex. Plaintiff told Dr. Holton that some abnormality was reported on the brain MRI from January 21, 2010.

On examination, Plaintiff's wrist dorsi/palmar flexion was 50/60. Dr. Holton noted the healed surgical scar of the right volar wrist was consistent with carpal tunnel release. Muscular

strength and tone was normal with a rating of five out of five in all four extremities. Dr. Holton found her fine finger manipulation to be normal. Dr. Holton's impression was carpal tunnel syndrome, status post right carpal tunnel release; recurring headaches; and a history of depression. Dr. Holton opined that, based on her history, Plaintiff would likely be unable to perform repetitive work with her hands and would need frequent rest breaks as needed.

On January 11, 2011, Plaintiff underwent a consultative examination by family practitioner, Harold M. Bacchus, MD. Plaintiff reported that she was seeking disability benefits due to carpal tunnel syndrome, depression, migraines, seizures, memory loss, black outs, and blurred vision. Plaintiff reported migraine headaches three to four times per week with light and noise sensitivity and throbbing pain that migrated to her neck; problems dropping objects and opening jars, lids, and knobs; and numbness/tingling and pain radiating up her right shoulder. Plaintiff also reported some short-term memory loss since her last seizure in 2009. She reported a suicide attempt in October 2010 from sleeping pills but said that she was not suicidal and felt emotionally stronger than she was. She reported no limitations in sitting, standing, or walking and that she performed her activities of daily living independently. She reported her medications as Cymbalta, Naproxen, Protonix, and Topamax. Dr. Bacchus found her grip strength to be 4/5 on the right and 5/5 on the left. He found that her fine and gross dexterity was preserved but slower on the right, and she had dullness to sensation of the right fingers. Her mental status was crying with flat affect and depressed mood. Dr. Bacchus's impression was history of seizure disorder treated with Topamax, status post carpal tunnel release with residual pain and intermittent numbness, and migraines.

On February 5, 2011, J. Sands, M.D. completed a physical residual functional capacity ("RFC") questionnaire. He noted a primary diagnosis of carpal tunnel syndrome with a secondary

diagnosis of seizure disorder and migraines. He found that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; could sit or stand for six hours in an 8-hour workday; was limited in her right upper extremity with respect to pushing or pulling; could never climb ladders, ropes and scaffolds; could occasionally climb ramp/stairs, balance, stoop, kneel, crouch, or crawl; was limited to occasional use of her right upper extremity for reaching in all directions (including overhead), handling, fingering, and feeling; and was to avoid working around hazards, including unprotected exposure to heights and operation of heavy machinery due to weakness in the right upper extremity. Dr. Sands noted that Plaintiff's seizures were controlled with medication. Dr. Sands cited the clinical findings of right hand grip decreased to 4/5 with slower fine and gross dexterity and sensory dullness in the right fingers. Dr. Sands found Plaintiff partially credible because there was no medical evidence of record to support her complaint of blurred vision.

b.      Mental impairments

On February 25, 2010, Plaintiff underwent a mental status consultative examination by Wayne J. Von Bargen, Ph.D. He noted Plaintiff's complaints were carpal tunnel syndrome and depression. She wore a split on her right wrist, and her affect was slightly anxious. Plaintiff reported that she had surgery on her right wrist but that her symptoms of tingling and numbness were returning and that the symptoms were beginning in her left wrist. She reported medications of Imitrex, amitriptyline, Protonix, and Effexor. She reported that the Effexor helps and that she cries all the time. Dr. Von Bargen's impression was adjustment disorder with mixed anxiety and depressed mood with mild concentration difficulty probably secondary to anxiety with a GAF of 60. Dr. Von Bargen's opinion was affirmed on April 1, 2011, by Dr. M. Ruiz.

On January 5, 2011, Plaintiff underwent a second consultative examination by Dr. Von Bargen, who noted the previous diagnosis. Plaintiff reported sleep disturbance, appetite disturbance, social withdrawal, a past suicide attempt, little motivation, and little accomplished in a typical day. Dr. Von Bargen opined that, other than mild concentration difficulty, secondary to anxiety and depression, her cognitive function appeared intact. The impression was recurrent moderate major depressive disorder and anxiety disorder with a GAF of 55.

On January 26, 2011, Donna Unversaw, Ph.D. completed a mental residual functional capacity assessment form, finding the Plaintiff was moderately limited in her ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Unversaw gave great weight to the opinion of Dr. Von Bargen, as it was consistent with the available evidence. Dr. Unversaw did not find Plaintiff to be fully credible as to her claims and their severity. Dr. Unversaw opined that Plaintiff could understand, remember, and carry out simple repetitive tasks, could relate on a superficial basis with coworkers and supervisors, could attend to tasks for sufficient periods of time, and could manage the stress involved with simple work. Dr. Unversaw concluded that despite Plaintiff's limitations from her mental condition, she retained the ability to perform simple repetitive tasks on a sustained basis without special considerations.

Dr. Unversaw also completed a psychiatric review technique form, finding that Plaintiff suffered from major depressive disorder, moderate, and anxiety disorder. Dr. Unversaw considered Plaintiff's impairments under Listings 12.04 and 12.06, finding a mild degree of limitation in

difficulties in maintaining social functioning, a moderate degree of limitation in restriction of activities of daily living, a moderate degree of limitation in difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation.

## C. Plaintiff's Testimony

Plaintiff last worked in 2009 as a CNA and was terminated due to almost dropping a patient. She did not return to work due to migraine headaches and fainting spells. After Plaintiff was terminated, she received unemployment benefits and looked for work, but did not actively pursue another job due to her impairments. She did not seek additional treatment for her carpal tunnel syndrome or depression because she has no medical insurance and the Matthew 25 Clinic would provide only limited treatment.

In 2005, Plaintiff had carpal tunnel surgery on the right wrist; however, the numbness and pain returned, which she attributed as the reason she nearly dropped a patient at her employment. The numbness traveled all the way up her right arm, with issues bilaterally including difficulty brushing her teeth, combing her hair, typing, writing, and gripping. Some days were better than others, but when numbness came over her hand or arm, she would have to rest 20-30 minutes before regaining feeling. She testified that she cannot open a jar of jelly and that she has problems zipping her pants.

Plaintiff testified that she had been experiencing migraine headaches for over 20 years with prior hospitalization and treatment. Plaintiff experienced migraines when she was employed, but between her carpal tunnel syndrome and the migraines, she was no longer able to work. Her migraines would begin in her neck and travel to her back and the front of her head within minutes. They occurred almost daily for three to four hours at a time and sometimes all day, for which she

was unable to do anything. Her headaches were aggravated by noise and sunlight. She tried to watch television or read, but was unable to when experiencing a migraine. Plaintiff took Topamax which assisted with her headaches but did not change the frequency of her migraines.

Plaintiff was born with seizures and underwent electric shock therapy as a child. She explained that there was difficulty getting her records at St. Joseph Hospital, which is where her seizures were primarily treated. Plaintiff had not had a seizure since 2009, but continued to experience lightheadedness.

Plaintiff testified that she suffered from chronic depression for over 15 years, which had become worse over the past few years. Plaintiff had been on four or five different medications that did not help. She explained that one of the medications made her want to kill herself, leading to a suicide attempt with pills that her daughter stopped.

In 1987, Plaintiff was addicted to cocaine, spending three years in prison. She has not been involved with drugs since that time. At the time of the hearing, Plaintiff was homeless and had at times resided with her father, her aunt, and most recently her cousin. Plaintiff did not do chores and received a lot of assistance from her daughter, including laundry and shopping. Plaintiff did not cook due to problems with her hands.

Plaintiff testified that her medications were Effexor, Protonix, Topamax, Ultram, and Zoloft.

### D. Vocational Expert Testimony

The ALJ presented the following hypothetical to the vocational expert:

> This individual is not able to perform work that imposes a close regimentation of production, close regimentation of work activity, as a consequence of certain operational demands for functioning within close tolerances or for an unusually rapid level of productivity.
> Employees in this work face rigid expectations with close and critical supervision that might be required when there is a high value placed by the employer

on the product quality, the raw materials, the equipment employed, upon coordination with other workers in the pace of production.

Close and critical supervision in this context would produce unacceptable distress, and it would prevent accommodation of personal discomfort. This work is defined by the differences from other jobs that allow the employee some independence in determining either the timing of different work activities or the pace of work. Such flexibility as that in the work structure permits the employee an opportunity to catch up with ordinary productivity, especially when there has been a respite.

This person cannot lift and carry greater than ten pounds occasionally or five pounds frequently. Predominant use–and this would involve predominant use of the left, non-dominant arm and hand in the course of lifting.

This person cannot successfully engage in work demanding *constant* manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with the hands or fingers. This individual cannot undertake work in hazardous conditions. Such work would include jobs requiring balance in the context of unprotected heights. This individual can't work around dangerous machinery or around vehicles moving in close quarters.

(AR 51-52) (emphasis added).

The VE responded that all past relevant work would be excluded. However, she testified that there would be employment as a telephone order clerk, DOT # 209.567-014, sedentary, SVP 2 (250 jobs in region and 2,000 in Indiana); addresser, DOT # 209.587-010, sedentary SVP 2, (25-50 jobs in the region, 200 in Indiana, and 30,000 in the nation); and charge account clerk, DOT # 205.367-010, sedentary SVP 2 (500 jobs in the region, 3,000 in Indiana, and 20,000 in the nation).

The VE testified that the lifting, carrying, and disproportionate use of the non-dominant hand is what caused the jobs to remain at the sedentary level. The VE responded affirmatively when asked if her testimony about the jobs was consistent with the characterization of the jobs in the DOT.

Plaintiff's counsel then inquired whether the jobs available would change if the hypothetical included "occasional," as opposed to "not constant," in the ALJ's hypothetical for manipulating involving fine work, gripping, grasping, and handling. The VE explained it would eliminate the

identified jobs. The VE then offered that the jobs of callout operator and surveillance system monitor would exist but did not provide DOT numbers or the number of jobs in the economy.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings."

*White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

### DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant

numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity?  If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe?  If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations?  If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work?  If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal or remand of the ALJ's decision for three reasons: (1) the ALJ failed to properly weigh and consider all the evidence of record, resulting in an erroneous RFC determination; (2) the ALJ improperly weighed Plaintiff's credibility; and (3) the ALJ's step five finding was made in error. The Court finds that remand is required because the evidence of record, including the consultative medical opinions, regarding Plaintiff's right upper extremity limitations are inconsistent with the RFC, and the VE testimony supports a finding of disabled if the RFC is adjusted to reflect those greater limitations. The ALJ's evaluation of this right upper extremity impairment is implicated in Plaintiff's RFC, credibility, and step five arguments, and the Commissioner offers no position in response.

The RFC, which is at issue at steps four and five of the sequential evaluation, is a measure of what an individual can do despite the limitations imposed by her impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a)(1), 416.945(a); SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The evidence relevant to the RFC determination includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. SSR 96-8p, at *5. The ALJ "must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. In addition, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because

they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

As for the credibility determination, once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms.20 C.F.R. §§ 404.1529(a); 416.929(a). The ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work, although subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* The ALJ must weigh these subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). When evaluating the record as a whole, the ALJ also considers any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1); 416.929(c)(1). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record."

*Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

In this case, Plaintiff's right upper extremity limitation was based on her history of carpal tunnel syndrom. In his analysis of the medical evidence, the ALJ noted that the neurological examination of Plaintiff's right hand was not normal, "where grip strength was reduced on the right and fine manipulation was slower but possible on the right. There was evidence of a healed scar on the right wrist from the claimant's previous carpal tunnel release surgery there, which the claimant testified was done in 2005." (AR 23). The ALJ also recounted Plaintiff's testimony that it took nearly a year to completely heal after the surgery, that she felt better for awhile, but that the symptoms of pain and numbness returned in her right wrist, going up to her shoulder and that she was starting to experience the same symptoms in her left hand. The ALJ noted that no EMG had been done.

The ALJ concluded: "Because there is evidence that the claimant has problems with carpal tunnel syndrome in her right hand, and may be developing carpal tunnel in the left hand, the limitations on lifting and carrying, using only the left hand to lift, and *no constant* manual manipulation were included in the residual functional capacity above." (AR 23) (emphasis added). The ALJ then explained why he found that Plaintiff was not more limited. First, he noted that grip strength in her right hand was "still 4/5" and Plaintiff was able to button and zip at the exams. *Id*. He commented that there were not complaints of carpal tunnel syndrome symptoms in the treatment records until February 2010 and minimal complaints since then, with "no new treatment for this other than prescriptions for Ultram and/or Naproxen for pain with no referral for a surgical evaluation by Matthew 25." The ALJ found that "[t]he lack of ongoing complaints about wrist

problems at Matthew 25 fails to support the extent of the inability to hold on to anything as the claimant alleged at the hearing, and reduces credibility of the claimant about this problem." (AR 23). Finally, the ALJ wrote: "The judge notes that the claimant has a history of criminal activity involving illegal drug abuse that diminishes her overall credibility." (AR 23).

As a result, the ALJ included the same limitation in the RFC–that Plaintiff "cannot successfully engage in work demanding *constant* manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with hands or fingers." (AR 22) (emphasis added). The Court finds that the ALJ's analysis of Plaintiff's right upper extremity impairment and resulting limitations is not supported by the medical record or a sound credibility determination. The ALJ failed to build a logical bridge between the evidence and Plaintiff's RFC. Most of the bases relied on by the ALJ for discrediting Plaintiff's right upper extremity limitations are faulty.

First, and most significant, the ALJ's analysis of the opinions of Dr. Holton and Dr. Sands is inconsistent. The ALJ notes that the doctors "concluded that [Plaintiff] could lift 20 pounds occasionally and 10 pounds frequently and *occasionally* use her right upper extremity to reach." (AR 24) (emphasis added). However, the ALJ "disagree[d] with this lifting/carrying/reaching assessment based on the findings at the consultative physical exams, and *giving the claimant's testimony about limits on using her hands and limited lifting the benefit of the doubt*." *Id*. The ALJ then found greater lifting/carrying restrictions but, inexplicably, *less* "reaching" limitations: "the claimant cannot lift more than 10 pounds occasionally and 5 pounds frequently. Likewise, the claimant cannot perform *constant* manipulation due to carpal tunnel syndrome. However, the claimant failed to establish that her ability to manipulate was more limited than this or that she could not reach because exam of her

right shoulder was within normal limits." *Id*. It is unclear how reducing the limitations supported by her testimony constitutes giving Plaintiff "the benefit of the doubt."

In his February 16, 2010 opinion following a consultative examination, Dr. Holton opined that Plaintiff "would likely be unable to perform repetitive work with the hands and would need frequent rest breaks as needed," even though he found that her fine finger manipulative abilities appear "normal." (AR 313). In the February 5, 2011 physical residual functional capacity assessment, consultative reviewer Dr. Sands found that Plaintiff was limited in her ability to push and pull with her right upper extremity. Dr. Sands noted that Plaintiff's right upper extremity grip was decreased to 4/5, that she had slower fine and gross dexterity in the right upper extremity, and that she had sensory dullness in her right fingers. Nevertheless, he found that she was limited to "occasional" use of her right upper extremities in all manipulative limitations of reaching in all directions (including overhead), handling (gross manipulation), fingering (fine manipulation), and feeling (skin receptors). Dr. Sands further imposed a limitation that Plaintiff avoid concentrated exposure to hazards, such as machinery and heights, because of the weakness in her right upper extremity. In evaluating the severity of her symptoms, Dr. Sands noted that the medical evidence of record showed evidence of carpal tunnel syndrome, indicating that he found Plaintiff *credible as to that limitation*.

Although the RFC determination is administrative and not medical, the ALJ's decision must be based on the evidence and must be logical. The only reason the ALJ gave for finding less hand limitation was that the exam of her right shoulder was within normal limits. However, the consultative physicians limited Plaintiff's ability to reach not on her shoulder but rather on her hand and wrist.

Moreover, most of the ALJ's credibility analysis does not draw into question Plaintiff's credibility as to her right hand weakness or the consultative physician's limitation of occasional use of the right upper extremity in all manipulations. Although the ALJ recognizes Plaintiff's testimony that her pain and numbness have returned, going up to her shoulder, the ALJ does not discuss Plaintiff's specific testimony, set forth in the background section above, regarding the limited use of her right hand, especially how it impacts her activities of daily living.

In noting that no EMG had been done, the ALJ failed to explore Plaintiff's financial situation and inability to pay for an EMG. Under Social Security Ruling 96-7p, explanations provided by the claimant at the hearing may demonstrate good reasons why the claimant does not seek medical treatment or does not pursue treatment in a consistent manner; one of these reasons is that "the individual may be unable to afford treatment and may not have access to free or low-cost medical services." SSR 96-7p at *8; *see also Craft*, 539 F.3d at 679 (recognizing that the an ALJ "must not draw any inferences" about the claimant's condition from failure to seek treatment unless the ALJ has explored the claimant's explanations as to the lack of medical care and that an inability to afford treatment is one reason that can "provide insight into the individual's credibility" (citing SSR 96-7)).

After Plaintiff gave testimony about her right hand and wrist limitations, the ALJ asked, "Now, you said you haven't gone back to see a doctor for that, correct?" (AR 47-48), to which Plaintiff responded, "No, no. I don't have no medical, and I have mentioned it to Matthew 25 over and over and over, and they keep telling me, you need to go to see somebody else about your hand. There is only certain things that they'll do for you down at Matthew 25." (AR 48). The ALJ did not discuss this testimony. The medical record regarding other treatments Plaintiff did not pursue due to cost bolsters this testimony about treatment of her carpal tunnel syndrome. A February 23, 2010

"task note" from the Matthew 25 Clinic provides: "EEG's through MRS are to be scheduled through the referring MD's nurse. MRS is still supposed to be notified but we do not schedule them. Pt is fully responsible for the bill. Not sure pt is wanting to get the EEG done due to cost." (AR 471). A June 8, 2010 treatment note indicates that the Matthew 25 Clinic was unable to do an EEG due to financial reasons; Plaintiff also declined a GI referral for financial reasons that same date. Regarding treatment for mental health, Plaintiff testified that the Matthew 25 Clinic recommended that she go to Park Center, but Park Center charged $25 or $50 for the initial visit, and she did not have the money.

The ALJ erred in drawing a negative inference from the lack of an EMG or the infrequency of treatment for her carpal tunnel syndrome without exploring whether cost was a factor. If the ALJ was concerned by the lack of an EMG to substantiate the return of Plaintiff's carpal tunnel syndrome, the ALJ could have ordered one. *See Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000) (citing 20 C.F.R. § 404.1517). Similarly, the ALJ commented in his RFC analysis that there was no referral for surgical evaluation at the Matthew 25 Clinic but ignored the February 26, 2010 treatment notation that the "plan" was "ortho clinic." (AR 367). Again, Plaintiff explained that she had not sought treatment for her carpal tunnel syndrome because of cost.

Next, the ALJ discredited Plaintiff because she could button and zip at the "exams," citing the two consultative examinations. In Dr. Holton's February 16, 2010 examination report, there is no mention of being able to button or zip; rather Dr. Holton found that "[f]ine finger manipulative abilities appear normal," yet "she would likely be unable to perform repetitive work with the hands and would need frequent rest breaks as needed." (AR 313). Similarly, at the January 20, 2011 consultative examination, Dr. Bacchus made no finding regarding Plaintiff's ability to button and

zip; he found that she had right wrist tenderness but still had good range of motion, that her fine and gross dexterity was preserved but slower on the right, and that she had sensory dullness to the right fingers. At the hearing on September 28, 2011, Plaintiff testified that she was having trouble zipping her pants. The ALJ mis-cites the evidence of record and disregards Plaintiff's testimony that her hand weakness was getting worse. The ALJ also does not discuss Plaintiff's reports to Dr. Holton of numbness, weakness, and dropping things, or her similar reports to Dr. Bacchus, such as her difficulty opening jars, lids, and knobs, which is consistent with her extensive hearing testimony. The ALJ's inference regarding buttoning and zipping is unsupported by the cited evidence.

The ALJ also discredits Plaintiff's testimony overall because she "has a history of criminal activity involving illegal drug abuse." (AR 23). The ALJ fails to recognize that Plaintiff testified that she was addicted to cocaine for 10 or 11 months in 1987 and spent time in prison for possession, all of which occurred over *twenty years* prior to her onset date. She testified that she had not been involved with illegal drugs since she was released; there is no evidence of recidivism in those twenty years. The Plaintiff went on to build a long work history working for a newspaper, in manufacturing, as a driver, in assembly, and most recently as a CNA after taking a six-week certification course. In fact, Plaintiff's long work history was built notwithstanding her migraine headaches and seizures, a fact that should have weighed in favor of her credibility, not against it. It was disingenuous of the ALJ to discredit Plaintiff for her involvement with illegal drugs during a chapter of her life long since closed.

In this case, the errors in the credibility determination and analysis of the medical evidence affected the limitations in the RFC, which directly impacted the outcome at step five. *See Craft*, 539 F.3d at 680. The ALJ posed a hypothetical to the VE that was consistent with the RFC, explaining

that the hypothetical "person cannot successfully engage in work demanding *constant* manipulation involving fine work, gripping, grasping, twisting, turning, picking, pushing, or pulling with the hands or fingers." (AR 52) (emphasis added). However, if the ALJ had relied on the consultative opinions that Plaintiff be limited to *occasional* use of the right hand for fingering, feeling, and handling, the limitation likely would have had a significant impact on the jobs available as bilateral manual dexterity is required for almost all unskilled sedentary work. *See* SSR 96–9p, 1996 WL 374185, at *8 (July 2, 1996). In fact, when asked by Plaintiff's attorney at the hearing if the hypothetical were changed to *occasional* manipulation involving fine work, gripping, grasping, fingering, and handling with the right upper extremity, the VE testified that the jobs she had identified would be eliminated. Although the VE then identified the positions of callout operator and surveillance system monitor, the VE did not offer any DOT listing or the number of jobs in the economy. Accordingly, remand is required.

## B. Other Arguments

*1.    Step Two*

Plaintiff takes issue with the ALJ's step two analysis, in which the ALJ did not identify any specific severe impairments, but rather found generally that Plaintiff "has severe impairments." (AR 17). Rather than identifying which of Plaintiff's impairments are severe, as is done in the vast majority of decisions, the ALJ spent five paragraphs explaining why he did not have to identify any severe impairment with particularity, citing *Taylor v. Schweiker*, 739 F.2d 1240, 1243 n.2 (7th Cir. 1984), and *Ishmael v. Barnhart*, 212 F. Supp. 2d 865 (N.D. Ill. 2002). This ALJ is apparently not the only one to take this course, with at least one court having found that the failure to specify *which* impairment is severe at step two is not reversible error, explaining that "step two is essentially a

gatekeeping function [and that] [i]f a severe impairment is found, the analysis proceeds to step three to consider if an impairment or combination of impairments–including those not found to be severe at step two– meets a listed impairment." *Cole v. Astrue*, 09 C 2895, 2011 WL 3468822, at *5-6 (N.D. Ill. Aug. 8, 2011) ("Thus, while the ALJ's step two discussion could certainly have been more carefully written, his failure to name the condition he found to be severe does not, in itself, warrant reversal.").

Regardless, remand is not warranted on this point because the ALJ in fact conducted an analysis of which impairments he found to be severe. However, he conducted the analysis after his step three analysis but before determining the RFC. The analysis is identical to that normally seen at step two. It is not clear why the ALJ failed to do the analysis at step two, where the analysis assists the reader in understanding the ALJ's subsequent step three analysis under the listings that is based on those severe impairments. The ALJ offers no reason not to perform the severity analysis at step two.

2.     *Headaches*

Plaintiff argues that the ALJ's consideration of her migraine headaches is inaccurate. In the opening paragraph of the RFC analysis, the ALJ found that Plaintiff does not "have a severe impairment of migraine headaches" and that Plaintiff "did not allege medications for this condition." (AR 21).[1] Confusingly, the ALJ had already considered whether Plaintiff met a listing at step three for migraine headaches.

---

[1] Plaintiff argues that the ALJ made inconsistent findings of "severe" and "not severe" regarding her headaches. (Pl. Br. 11-12). However, Plaintiff appears to have confused the ALJ's finding that her seizure disorder is severe but controlled with medication with the ALJ's finding that the migraine headaches are not severe.

The record is replete with treatment records adjusting Plaintiff's migraine medications, changing between Imitrex, Ultram, and Naproxen. The ALJ did not discuss these medications or the fact that Plaintiff's doctors were adjusting the medications because Plaintiff was not getting relief. Rather, the ALJ focused solely on "evidence that she remained on Topamax for headaches as well as seizure control with no significant changes in her course of treatment in the last couple of years suggest[ing] that the headaches are not a severe impairment . . . ." (AR 22). On remand, the ALJ shall consider all of Plaintiff's migraine medications and the fact that they were often changed.

Plaintiff also argues that the ALJ did not properly consider the MRIs that showed white matter lesions with possible sources as chronic small vessel disease, demyelinating process, prior inflammation or vasculitis. To the extent that the ALJ is unable to determine the meaning of the MRIs in relation to the record of Plaintiff's ongoing complaints of migraine headaches and changing medications over the years, a medical expert would provide the necessary interpretation. If Plaintiff's complaints are fully credited, her migraine headaches would affect her ability to remain on task during the workday.

3.    *Concentration, Persistence, and Pace*

In performing the special technique for evaluating mental impairments at step three of the sequential analysis, the ALJ found that Plaintiff has moderate limitations in activities of daily living and moderate limitations in concentration, persistence, and pace. Plaintiff argues generally, without explanation, that the ALJ's RFC and hypothetical placing restriction on closely regimented work with critical supervision does not account for these moderate limitations. Remand is not warranted on this basis.

*4.*     *Combination of Impairments*

Plaintiff contends that the ALJ failed to consider her severe and non-severe impairments in combination, namely her migraine headaches, carpal tunnel syndrome, seizure disorder, nausea, depression, intermittent sinus arrhythmia and tachycardia, gastroesophageal reflux disease, insomnia, syncope, blurred vision, memory loss, and anxiety. However, Plaintiff does not suggest what additional limitations would result. Moreover, the ALJ did consider Plaintiff's impairments in combination, stating that Plaintiff did not "have an impairment or combination of impairments that meets or medically equals any one of the listed impairments." (AR 18); *see Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008) (holding that the ALJ who made a finding that the claimant's impairments were not severe enough, "either singly or in combination," to equal a listed impairment satisfied the requirement that an ALJ consider the aggregate effects of a claimant's impairments, including impairments that, in isolation, are not severe).

*5.*     *Step Five*

Finally, Plaintiff makes several additional arguments regarding the ALJ's step five analysis. On remand, should the VE offer testimony regarding the account clerk position, the ALJ shall clarify with the VE whether the DOT number is 205.367-010 or 205.367-014 as well as the SVP level for the position. Also, depending on the ALJ's analysis of Plaintiff's carpal tunnel syndrome on remand, the ALJ shall inquire about the requirement of bilateral use of the hands and fingers of each job. Plaintiff's arguments regarding the number of jobs available are mooted by the remand of the RFC and credibility determinations.

**CONCLUSION**

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Memorandum in Support of Summary Judgment or Remand [DE 14], and **REMANDS** the Commissioner of Social Security's final decision for further proceedings consistent with this Opinion and Order.

So ORDERED this 17th day of March, 2014.

s/ Paul R. Cherry_____
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record